Faerber vs. The T. B. Scott Lumber Co. (Limited).

FAERBER, Administrator, Respondent, vs. THE T. B. SCOTT LUMBER COMPANY (LIMITED), Appellant.

*September 30 — October 17, 1893.*

*Master and servant: Death of servant caused by negligent management of " slab burner ": Evidence: Remarks of counsel.*

1. In connection with its sawmill defendant had a " slab burner," constructed of sheet iron, in three sections, in all about ninety-five feet high, the lowest section, which was . lined with brick, being thirty-five feet high and forty feet in diameter, and the highest section about twenty-one feet high and seventeen feet in diameter.

Faerber vs. The T. B. Scott Lumber Co. (Limited).

In this burner the slabs and other refuse of the mill had to be disposed of as fast as they accumulated, in order to prevent their overwhelming the works. The only safe way to use the burner was to kindle the fire early in the morning, so that the slabs should be consumed as fast as they were conveyed to it, since, if a large quantity of slabs accumulated in the burner, they would overheat it and open the seams or burst its sides, as had happened once, some years before the day in question. On that day, through a failure to get the fire properly started, there was an accumulation of slabs which nearly filled the lowest section of the burner, and about the time the mill shut down at noon they became fully ignited, and the intense heat caused the burner suddenly to collapse, the highest section falling upon and killing plaintiff's intestate, who was passing. *Held*, that the accident was caused by defendant's negligence in not stopping the mill during the morning so as to allow the burner to clear itself and thus avoid the accumulation of slabs therein.

2. The refusal to allow a witness to testify that the burner was built like other approved burners used in similar mills was not error, since the accident was not caused by any defect in its construction, but by its negligent and improper use.

3. The negligence of defendant's superintendent who had full charge of the burner and its management on that day was negligence of the defendant.

4. Remarks of plaintiff's counsel in his argument to the jury, charging defendant with being actuated by motives of parsimony in neglecting to repair or replace the burner after the former injury to it, are *held* not to have been improper.

APPEAL from the Circuit Court for *Lincoln* County.

Action to recover damages for the death of plaintiff's intestate. The facts are stated in the opinion. The defendant appeals from a judgment in favor of the plaintiff.

For the appellant there was a brief by *Winkler, Flanders, Smith, Bottum & Vilas,* and oral argument by *E. P. Vilas. John H. Brennan,* for the respondent.

ORTON, J. The main facts of this case are as follows:

At the time of the accident that caused the death of the respondent's intestate, the appellant company owned and

Faerber vs. The T. B. Scott Lumber Co. (Limited).

operated, and for many years had owned and operated, at Merrill, in Lincoln county, this state, a very large sawmill, of the capacity to cut or saw 150,000 feet of lumber in one day of eleven hours. In connection with said mill, and necessary to its successful business, there was operated an immense slab burner, constructed of sheet iron riveted together at the joints, and circular in form. The lower section or base had perpendicular sides, and was thirty-five feet in diameter, and about forty feet in height; the second section, riveted to the top of the lower section, was cone-shaped, and thirty-two feet in height, reduced at the top to about seventeen feet in diameter; and the upper or top section was about twenty-one feet in height, with straight or perpendicular sides, with a wire screen or spark catcher at the top. The whole structure was about ninety-five feet in height. The top part, alone, weighed 5,000 pounds. The lower part was lined with brick masonry to within a few inches of the cone, and was sixteen inches thick at the bottom, and grew less towards the top. There were no ribs or framework inside to sustain or protect it. The sheets or pieces of sheet iron used in its construction were forty-three inches wide by nine feet in length, and they were riveted or bolted together at the seams. There was a large opening or door near the top of the lower section, through which the slabs and other refuse entered the burner, and there were two openings or doors near the bottom, on opposite sides, used for kindling and making fires, and for going into it, and perhaps for draught.

It will be observed that this is a thin and hollow cylinder thirty-five feet in diameter, and nearly 100 feet high, standing and bearing up many tons in weight by its own unsupported strength. The diminishing diameter of the conic section would naturally so compress the expanding gases and heated air within the lower section as to challenge to its utmost its power of resistance. From its great dimensions,

it is obvious to any one that this was a very weak and un-
reliable structure, but sufficient for the prudent use for
which it was intended.   From the mill to its upper opening
or door there was a "conveyor" or "traveler," as it was
called, for conveying all the slabs and other refuse from the
mill to the burner as fast as they accumulated.   It is nec-
essary that this conveyor should do its work constantly
while the mill runs its saws, or these accumulations would
overwhelm the works, and there is no other way of dispos-
ing of them.   Another thing must be considered: The logs
to be sawed are often, if not usually, drawn into the mill
from the water, and many of the slabs are still wet when
they reach the burner.   They are not only hard to burn, but
steam, as well as gases, is generated.   The testimony appears
to be uncontradicted that the only safe and proper way
to use the burner is to kindle a fire at the bottom early in
the morning, before or at the time the mill starts up, so as
to have the slabs consumed as fast as they are received.
The mill and the burner and the conveyor should run to-
gether.   If the mill and conveyor run before there is a good
fire started, the burner becomes filled and packed with wet
slabs, which not only retard or prevent the building of the
fire, but by the time the fire begins to consume the slabs
there will be a superincumbent mass of wet slabs nearly to
the top of the lower section; and when they become dry
enough to burn, and the whole mass takes fire, it is a scien-
tific certainty that the burner will become so intensely and
unusually heated as to greatly injure, if not destroy, the
burner itself.   The pent-up steam and gases within this
burning mass of over thirty feet in diameter and nearly
forty feet in height has to be compressed and escape through
this cone-shaped cylinder above.   The most natural conse-
quence would seem to be that its seams would be opened,
its sides twisted and rent, and the whole structure topple
to the ground.   It never was intended to meet such a trial

of its strength. It was intended that the slabs should be
burned as fast as received, and the burner kept open and
clear as possible; and so it would be, if a good fire is started
before the mill and conveyor begin their work. The witness
Anderson, who was foreman of the works in 1886, testified
"that during all the period he was there the fire was started
up in the morning, and well going before the mill was
started; that was the fact and the rule while he was there."
These facts were verified by a practical trial and experiment
in the summer of 1886. "There was one day that they
didn't get the fire started promptly in the morning, and the
conveyor and mill ran till probably nine o'clock, and filled
the burner up, without enough fire in it to burn the slabs.
It filled up very nearly to the opening where the slabs come
into it, and we built a fire in it through those doors, and
tried to get the fire started in it. The mill kept running.
In that way, it was overloaded all day, and wet slabs got to
running into it, and in the evening, after the mill was shut
down, the fire got to burning, and it overheated the burner
in the top part, where it was red hot, and the draught
through there seemed to *work* the burner in the cone part;
and when it cooled off it was shrunk in two places by over-
heating, and it sank in a couple of places, and the screen
sank in, also, and the conveyor caught fire in one spot.
Mr. Biron, the millwright, and Mr. Hixon, the secretary of
the company, were present." This was the testimony of
Edward Anderson. This witness testified, further, that
"after that all we done was to see that the fire was started
in the morning, and be certain of it, before we started up
the mill." After that it seems that the men were instructed
not to allow the fuel to get higher in the burner than a
certain fixed line; "the danger line," as it was called by
Mr. Graham, the superintendent. The "dents and sagging"
in the iron remained in plain sight, as a warning not again
to so overheat the burner. One witness saw that the rivets

were out or broken, and iron sheets loose, as an effect of such overheating in 1886.

On the 28th day of September, 1891, in the morning, before 6 o'clock, there was an attempt to start a fire in the burner before the mill started, but just after the mill started some small wet Norway slabs came through the conveyor and put it out. At 7 o'clock they broke up an oil barrel, and attempted to start the fire again, and then broke up more oil barrels; but it burned slowly, and slabs came in incessantly. They tried to increase the fire by the use of shavings and kerosene oil. About 9 o'clock, Graham, the superintendent, came, and saw the condition of the fire in the burner. He gave some directions, and went away. About 10:30 o'clock the fire started up a little better. At 11 o'clock, Graham looked down into the burner, and it was full of smoke. He was told that the burner was full · of slabs. Some one tried to throw the slabs out of the conveyor as fast as they came, but this could not be done. All this time the mill was running, and the slabs were coming into the burner, and had been coming about five hours before 11 o'clock, when the fire got under headway. About 12 o'clock the fire seems to have ignited the whole mass within the burner, and it became an intensely hot fire, and the heat and flames shot up into the air above the burner; and, between 12 and 1 o'clock, Louis Knudson, the deceased, who was ordered to do certain work as a carpenter, which required him to go in a pathway along by and near the burner, happened to be at that time in the very spot where he came to his death. Just as he was passing by the burner, it suddenly collapsed or broke to pieces, and the third or highest section came to the ground headforemost, and fell upon the ill-fated Knudson, and, of course, killed him instantly.

This action is brought by the administrator of his estate to recover damages for the benefit of his estate, according

to the statute, on the ground that his death was caused by the culpable negligence of the defendant company. The jury returned a verdict for the plaintiff for the sum of $5,000, and the defendant has appealed from the judgment. The defendant moved to set aside the verdict and grant a new trial therein, on the grounds that the verdict is contrary to the law and to the evidence, and the damages excessive.

1. The main question in this case is upon its merits, on the exception to denying the said motion for a new trial. The third contention in the brief of the learned counsel of the appellant is headed as follows: " The proximate cause of the falling of the burner was clearly shown to have been the *excessive heat* suddenly generated by the cessation of fresh fuel falling upon the fire, upon the mill shutting down for the noon hour. No negligence, unless it be that of a fellow-servant, is shown by the evidence, but it was an unforeseen and unexpected accident." This is an admission that the proximate cause of the falling of the burner *was the excessive heat suddenly generated*. It is too clear for question that the same cause that produced the excessive heat that caused the burner to shrink and bulge out, and to open its seams and tear out the rivets, and to nearly collapse it, in 1886, produced the excessive heat that caused it to fall at the time of this fatal accident. It was certainly not the stopping of the mill at noon, but it was not stopping the mill in the morning, and all along the forenoon, until the fire was sufficient to consume the slabs as fast as they came in. The witnesses all agree that this was the only safe and proper rule. It is obvious, and a natural consequence, that when such a mass of material was all on fire at once it would produce just such excessive heat as the learned counsel admit caused the burner to fall. It was all on fire, and the heat most intense, and the flames rising above the top before the mill was stopped. The

mischief had been done. It was the negligence of the company, all along that forenoon, in not stopping the mill so as to allow the burner to clear itself and consume the slabs as fast as they came, and in starting up the mill in the morning before there was any fire to consume the slabs, that prepared the way and laid the train for the catastrophe that was sure to follow. The company had an experimental knowledge of such a consequence following such a cause, and they heeded it not, but repeated the experiment. Mr. Graham, the superintendent, when he looked into the top of the burner and found it packed full of slabs and many of them wet, must have known that when that whole mass became on fire the heat would be intense beyond all calculation, and that there was great and imminent danger that the burner would collapse and tumble to pieces, as it did. It was a frail structure at best, and after it had been weakened by seven years' constant use, and injured by excessive heat in 1886, any one might have known that it could not withstand this last most dangerous trial. The negligence of the company appears to have been established beyond a question or doubt.

2. The second error assigned is allowing the witness Shank to answer the question whether one man could take off from the conveyor all the slabs as fast as they came. This was not a question for an expert. It could be intelligently answered by any one acquainted with the business, and it was not material. It is sufficient that the slabs were not taken off as fast as they came. The efficient remedy was apparent, and that was to stop the mill and making slabs, until they could be disposed of safely by burning in the usual way. The usual way was the safe way, and those two extraordinary instances — the last one followed by such a fatal result — were the most careless and dangerous ways of using the burner, and the company had abundant reason to know it.

Faerber vs. The T. B. Scott Lumber Co. (Limited).

3. It is contended that the hypothetical question put to the expert witness was imperfect in stating the facts. They appear to have been, very fully and correctly stated. But there is no place for expert testimony in this case. The causes of this injury are as clear as light to any one of ordinary intelligence and observation.

4. The refusal to allow the witness Worden to testify that this burner was built like other approved burners used in other mills of like capacity was not error. The injury was not caused by any defect in the construction of the burner, but by its negligent and improper *use.* The question was therefore immaterial.

5. The knowledge of all the material facts which constitute the negligence in this case was sufficiently brought home to the company by seven years' experience, so that we need not inquire whether the acts or knowledge of the superintendent or others in its employment bind the company. But there can be no doubt that Graham, superintendent, had full charge of the burner and its management on that last day, and that his negligence bound the company, and the charge of the court to the jury on that subject was clearly correct.

6. The remarks of the counsel of the respondent in his argument to the jury, charging the company with being actuated by motives of parsimony in neglecting to repair or replace the burner upon its injury in 1886, appear to have been within the license of forensic debate.

The case was ably tried on both sides, and the rulings and instructions of the court appear to have been fair and considerate, and the verdict is sustained by the evidence, and just, and we find no cause for disturbing it.

*By the Court.*— The judgment of the circuit court is affirmed.